# In the United States Court of Federal Claims

No. 12-601C

(Filed Under Seal:  November 19, 2012)

(Reissued for Publication: November 27, 2012) [1]

*****************************************  *
                                            *
                                            *
FIRSTLINE TRANSPORTATION SECURITY,          *
INC.,                                       *     Pre-Award   Bid   protest;   TSA
                                            *     Procurement for Airport Security
                          Plaintiff,        *     Services; Challenges to RFP Terms;
                                            *     Small Business Goals; Adequacy of
                                            *     Performance Information Furnished
v.                                          *     by Agency; Prejudice.
                                            *
THE UNITED STATES,                          *
                                            *
                          Defendant.        *
                                            *
*****************************************  *

*Bradley D. Wine*, with whom were *Pablo A. Nichols* and *Tina D. Reynolds*, Morrison & Foerster LLP, Washington, D.C., for Plaintiff.

*Shari A. Rose*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant.

---

[1] The Court issued this decision under seal on November 19, 2012 and invited the parties to submit proposed redactions of any competition-sensitive, proprietary, confidential, or other protected information on or before November 27, 2012.  The Government did not propose any redactions; however, Plaintiff proposed three categories of information for redaction: (1) the name and job title of the FirstLine official who submitted an affidavit (which FirstLine filed under seal) in support of the company's bid protest; (2) certain assertions made by that official respecting FirstLine's efforts to meet the terms of the challenged solicitation; and (3) the percent of FirstLine's revenue attributable to its ongoing contract to perform security screening services at the Kansas City airport.  The Court accepts and applies these limited proposed redactions, which are indicated in the decision by brackets and three asterisks, [* * *].

<u>OPINION AND ORDER</u>

WHEELER, Judge.

      In this pre-award bid protest brought pursuant to 28 U.S.C. § 1491(b)(1), Plaintiff FirstLine Transportation Security, Inc. challenges some of the terms in a solicitation issued by the Department of Homeland Security, Transportation Security Administration to provide passenger and baggage security screening services at the Kansas City, Missouri International Airport.  FirstLine successfully challenged a previous procurement for the same services and obtained permanent injunctive relief preventing the agency from proceeding with a proposed contract award.  <u>FirstLine Transp. Sec., Inc. v. United States</u>, 100 Fed. Cl. 359 (2011) (Bush, J.) ("<u>FirstLine I</u>").  The present protest relates to the agency's new solicitation for the security screening services at the Kansas City Airport.  As the incumbent contractor, FirstLine has been performing the required services through a series of bridge contracts while the protests were pending.[2]

      FirstLine raised multiple challenges to the new solicitation in its September 14, 2012 complaint, but now has narrowed its protest essentially to two arguments: (1) that TSA's establishment of a 40 percent small business participation goal is unlawful and irrational; and (2) that TSA failed to provide sufficient information about the required services in the solicitation that would permit offerors to compete intelligently and on relatively equal terms.  The parties have filed cross-motions for judgment on the administrative record, as well as response and reply briefs, and the Court heard oral argument on November 5, 2012.  At an initial Temporary Restraining Order ("TRO") hearing on September 18, 2012, Defendant voluntarily agreed to postpone the closing date for receipt of proposals until the Court decided this protest.

      TSA's 40 percent goal for small business participation is calculated as a percentage of the offeror's total contract price, not as a percentage of the offeror's proposed subcontracting plan.  FirstLine strenuously objects to such a goal, arguing that a calculation based upon the contract price is not in accord with Part 19 of the Federal Acquisition Regulation ("FAR"), and that it is not aware of the existence of qualified small businesses who could even approach the performance of 40 percent of the contract work.  For reasons that will be explained, if the Court were in the shoes of the agency, it would not structure the small business objectives for this procurement as the agency has done.  However, after careful consideration, the Court cannot say that the agency's approach is clearly unlawful, or that the approach lacks a rational basis.  As Defendant's counsel has emphasized, the 40 percent small business objective is merely a solicitation

---

[2]  Ordinarily, the present protest would have been assigned to Judge Bush as a related case under Rule 40.2 of the Court.  However, Judge Bush requested Judge Wheeler, the next judge in line to receive a new bid protest at the time of filing, to hear the case instead.

goal, not a requirement. The agency will be free to negotiate the best small business arrangement it can prior to contract award. This is a case where the Court must stay its hand and refrain from interfering with the procurement process.

On the second issue, the Court finds that TSA has provided sufficient information to offerors, both in the solicitation and elsewhere, so interested parties may compete on an informed and equal basis. No requirement exists for the agency to include all relevant information only in the solicitation. Accordingly, the Court grants Defendant's motion for judgment on the administrative record, and denies Plaintiff's cross-motion for the same, as well as Plaintiff's request for injunctive relief. However, the Court suggests to TSA, without requiring, that it amend Section M.4 of the solicitation to remove an ambiguity, and that it extend the closing date for receipt of proposals by 20-30 days from the date of this decision.

Background

Under the Screening Partnership Program ("SPP") of the U.S. Transportation Security Administration ("TSA"), TSA contracts with private companies to provide passenger and baggage security screening services at certain designated airports, among them the Kansas City, Missouri International Airport ("MCI"). Administrative Record ("AR") at Tab 1, p. 5; see also FirstLine I, 100 Fed. Cl. at 362-63. Plaintiff FirstLine Transportation Security, Inc. ("FirstLine") is the incumbent SPP contractor at MCI, and has been performing security screening services there since the fall of 2002. FirstLine I, 100 Fed. Cl. at 363. The company's most recent contract was awarded in 2006, for one base year plus four option years. Id. This contract expired on September 30, 2010. Since that date, FirstLine has performed security screening services under a series of short-term bridge contracts. Id. The MCI contract is FirstLine's [* * *], and accounts for [* * *] percent of its revenue. Declaration of [* * *] ("[* * *] Decl."), Dkt. No. 32-1, ¶ 4.

On April 10, 2010, in anticipation of the expiration of FirstLine's contract, TSA issued a Request for Proposals ("Prior RFP") for the provision of security screening services at MCI on a five-year, fixed-price basis (one base year plus four one-year options). AR at Tabs 17-19; FirstLine I, 100 Fed. Cl. at 363. After TSA completed its evaluation of proposals, it awarded the contract to Akal Security, and FirstLine protested the award to the GAO and then to this Court. Judge Bush sustained the protest on the basis of two major errors in TSA's evaluation process, and also agreed with FirstLine that certain aspects of the solicitation's pricing scheme were irrational – namely, that by ignoring out-of-contract transition costs, the solicitation skewed the price evaluation in favor of the proposal offering the least value to the Government. FirstLine I, 100 Fed. Cl. at 385-87. Although Judge Bush held that under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), FirstLine had waived its objections to this issue, she nonetheless concluded that because TSA was likely to resolicit the contract, it would be "inefficient to allow obvious and serious errors to recur in the resolicitation." Id. at

401.  Judge Bush therefore gave TSA the option of either amending the solicitation to correct the price evaluation scheme, or conducting a complete reprocurement.  Id. at 402-03.

TSA opted for the latter choice.  On July 23, 2012, TSA issued a second solicitation for the provision of security screening services at MCI, and requested offerors to submit their proposals by September 6, 2012.  AR at Tab 4, p. 42.  Like its predecessor, the new solicitation called for the award of a single fixed-price award-fee contract, consisting of one base year and four one-year option periods, to be awarded on a best value basis according to the specified evaluation factors.  Id. at p. 49, 180.

As relevant to this bid protest, Section L.6 of the solicitation states that the "Government anticipates an overall Small Business goal of 40 percent," and that "[w]ithin that goal, the government anticipates further small business goals of: [(1)] Small, Disadvantaged business[:] 14.5 percent; [(2)] Woman Owned[:] 5 percent; [(3)] HUBZone[:] 3 percent; [(4)] Service Disabled, Veteran Owned[:] 3 percent."  Id. at p. 175-76.  As discussed in greater detail below, TSA subsequently clarified that this "goal represents 40% of the total contract value."  Id. at Tab 6, p. 307 (Question 189).

On August 30, 2012, TSA extended the proposal due date to September 21, 2012.  Id. at Tab 5, p. 248.

On September 14, 2012, one week prior to the deadline for proposals, FirstLine filed this bid protest as well as motions for a TRO and a preliminary injunction.  Dkt. Nos. 1, 6, 7.  On September 18, 2012, the Court heard argument on the TRO motion.  After the Court indicated that it would grant the TRO, the Government agreed to stay the deadline for proposal submissions until such time as the Court entered its decision on the merits, thus mooting that motion.  See Dkt. No. 18 (order dated November 18, 2012).  In line with this agreement, TSA amended the solicitation on September 19, 2012 to extend the closing date for receipt of proposals to November 20, 2012.  AR at Tab 12, p. 633.

In its application for a TRO as well as in its opening brief on the merits, FirstLine challenged the terms of the solicitation on four grounds: (1) the allegedly improper establishment of a small business subcontracting goal of 40 percent of the total contract value, with certain additional sub-goals for subcontracting to specific categories of small businesses; (2) an alleged failure to provide information in the RFP adequate to enable potential offerors to prepare accurate and responsive proposals; (3) an alleged failure to correct the price evaluation scheme found irrational in FirstLine I; and (4) an alleged ambiguity as to whether proposed contract labor rates must comply with the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001) ("ATSA").  In addition, FirstLine asserted that TSA had improperly released sensitive information critical to the procurement to different offerors at different times, and thus on an unequal basis.

On the basis of statements made by the Government in the course of its briefing, FirstLine has withdrawn all but the first and second of these grounds.

Discussion

I.     Jurisdiction

This Court has jurisdiction under the Tucker Act to render judgment on "an action by an interested party objecting to a solicitation by a Federal agency for … proposals for a proposed contract or … any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." Id. However, as a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit, i.e., that it is an "interested party" within the meaning of Section 1491(b)(1). Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) (internal citation omitted).

The Federal Circuit has defined "interested parties" as "actual or prospective bidder[s] or offeror[s] whose direct economic interest would be affected by the award of the contract or by failure to award the contract," Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)); see also Distributed Solutions Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). In the pre-award context, a protester meets this standard where it adequately alleges that it has suffered or will suffer a "non-trivial competitive injury which can be redressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1362 (Fed. Cir. 2009).[3] Moreover, at the standing stage, the Court "assumes all non-frivolous allegations to be true[.]" Orion Tech., Inc. v. United States, 102 Fed. Cl. 218, 226 n. 10 (Fed. Cl. 2011) (internal citation omitted).

The Government does not dispute that FirstLine, as the incumbent contractor, has standing as an "interested party" with a direct economic interest in the award of the contract. Assuming, as it must, all of FirstLine's non-frivolous allegations to be true, the Court finds that Plaintiff has adequately alleged a non-trivial competitive injury that will accrue in the absence of judicial relief, and therefore has standing to bring this suit. See Weeks Marine, 575 F.3d at 1362.

---

[3] Courts in this jurisdiction have divided over whether the Weeks test applies in pre-award protests where the agency has already accepted bids or proposals. See, e.g., Golden Mfg., Inc. v. United States, --- Fed Cl.---, 2012 WL 4479422, at *7-9 (Fed. Cl. Oct. 1, 2012) (noting split and collecting cases). However, as there is no evidence in the record that TSA has yet accepted any proposals related to this solicitation, the Court need not reach this question.

II.     Standard of Review in Bid Protests

        In a bid protest, a court reviews an agency's procurement actions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides that a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id.; see also, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (internal citation omitted).  Under this standard, "[a] bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the Court determines whether a procurement decision either (a) lacked a rational basis, or (b) involved a violation of a statute or regulation.  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  "A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  Id. (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).

        The inquiry at this first step is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and de minimis errors in the procurement process do not justify relief.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States, 959 F.2d 929, 932–33, 935 (Fed. Cir. 1992)).  Accordingly, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Weeks Marine, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)).  In addition, while the Court "'may not supply a reasoned basis for the agency's action that the agency has not itself given,'" it must nonetheless "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  In re Applied Materials, Inc., 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) and Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), respectively).

        On the other hand, "[a] court must find an agency decision arbitrary and capricious if the government 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] was so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  BINL, Inc. v. United States, 106 Fed. Cl. 26, 36 (Fed. Cl. 2012) (quoting Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The protester carries the burden of proving that such an

error marred the procurement in question. CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988).

If the Court finds that the agency acted without a rational basis or contrary to law, it must then, at the second step, "determine… if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. at 1353, 1358. This prejudice determination is based on the same standard as the initial one made at the standing stage; however, at this step, the plaintiff must prove its allegations by a preponderance of the evidence. Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 207 (Fed. Cl. 2011); Sys. Applications & Techs, Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (Fed. Cl. 2011). Thus, in order to prevail on the merits, Plaintiff must demonstrate, by a preponderance of the evidence, that the unlawful or irrational terms in the solicitation caused it to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, 575 F.3d at 1362.

III.    Standards of Review for Judgment on the Administrative Record and for Injunctive Relief

As noted above, the parties have filed cross-motions for judgment on the administrative record pursuant to Rule of the Court of Federal Claims ("RCFC") 52.1(c). In reviewing such motions, "the court must determine whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 355 (Fed. Cl. 2009). The existence of a material issue of fact, however, does not prohibit the Court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. Id. ("In a manner 'akin to an expedited trial on the paper record,' the court will make findings of fact where necessary.") (quoting CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (Fed. Cl. 2007)).

In assessing a plaintiff's request for injunctive relief, the Court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009). The first of these factors, success on the merits, is the most important, Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007); however, no one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others," FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). In addition, "because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear."

CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 368-69 (Fed. Cl. 2010) (quoting NEQ, LLC v. United States, 88 Fed. Cl. 38, 47 (Fed. Cl. 2009)).

IV.    Analysis

The two grounds of FirstLine's challenge to the solicitation are: (1) the establishment of a small business subcontracting goal of 40 percent of the total contract value, with certain additional sub-goals for subcontracting to specific types of small businesses; and (2) an alleged failure to provide information in the RFP adequate to enable potential offerors to prepare accurate and responsive proposals.  The Court will address each of these grounds below.

A.  Subcontracting Requirements

FirstLine's primary objection to the SPP solicitation is to its establishment of a 40 percent small business subcontracting goal.  The relevant section of the solicitation, L.6 (Proposal Submission Requirements), states that the "Government anticipates an overall Small Business goal of 40 percent," and that "[w]ithin that goal, the government anticipates further small business goals of: [(1)] Small, Disadvantaged business[:] 14.5%; [(2)] Woman Owned[:] 5 percent; [(3)] HUBZone[:] 3 percent; [(4)] Service Disabled, Veteran Owned[:] 3 percent." AR at Tab 4, p. 175-76.  Further:

> [t]he contracting officer will review the subcontracting plan for adequacy, ensuring that the required information, goals and assurances are included in accordance with FAR 19.705-4.   The subcontracting plan will be negotiated prior to contract award.  If the apparently successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer before contract award, the offeror will be ineligible for award.

> Offerors will be required to demonstrate the extent of their Small Business participation through the submission of a small business subcontracting plan in accordance with the criteria set forth in FAR Part 19.704 'Subcontracting Plan Requirements.'  Thus any offeror that is not a Small Business must submit a Sub-Contracting Plan in accordance with FAR 52.219-9 that addresses all elements of FAR Part 19.704(a). The contracting officer will review the subcontracting plan for adequacy, ensuring that the required information[,] goals, and assurances are included in accordance with FAR 19.705-4.

Id. at p. 176.

As part of the procurement process, TSA accepted questions from potential offerors and, on September 10, 2012, issued a second amendment to the solicitation that contained, *inter alia*, written answers to the same.[4]  Id. at Tab 6.  In response to a question related to the measurement of the 40 percent small business goal, TSA stated that the "goal represents 40% of the total contract value."  Id. at p. 307 (Question 189).  TSA also answered affirmatively the question "[i]s it the TSA's intent that all large businesses [be] mandated to have, as a minimum, 40% small business participation … as part of their overall bid?"  Id. at p. 308 (Question 190).  In response to the question "[h]ow will the 40% goal be factored into the offeror's overall evaluation and score …?" the agency stated that plans "will be reviewed for adequacy…. [I]f the successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer … the offeror will be ineligible for award."  Id. (Question 191).  Finally, in response to the question "[w]ill offerors with less than 40% be disqualified?," TSA referred prospective offerors to its answer to the prior question.  Id. (Question 192).

On September 27, 2012, after Plaintiff initiated this bid protest, TSA amended its responses to several of these questions.  Id. at Tab 16, p. 710.  Specifically, in response to Question 190, which asked whether 40 percent small business participation, as a percent of total contract value, was "mandatory," TSA amended its answer to state:

> Failure to meet the stated 40% small business participation goal would not necessarily render a proposal ineligible for award.  However, the U.S. Small Business Administration (SBA) is responsible for ensuring that the government-wide goal for participation of small business concerns is established annually at the statutory levels, and the reporting agencies' (to include the Department of Homeland Security, of which TSA is a component) achievements are relative to the goals.  Consistent with these goals, TSA fully supports participation of small businesses in all full and open competitions, such as the current solicitation, to the greatest extent possible.  Offerors for this solicitation are therefore strongly encouraged to aggressively support the small business participation goals stated in the solicitation.  In the context of these goals and the locality for which an offeror develops its individual subcontracting plan, the TSA Contracting Officer will review any proposed subcontracting

---

[4] As noted above, TSA's first amendment, issued on August 30, 2012, extended the deadline for proposals from September 6 to September 21, 2012.  AR at Tab 5, p. 248.

> plan to ensure that the offeror has demonstrated due diligence
> in its efforts to meet the stated goals.

Id.  TSA further amended its responses to Questions 191 and 192 to refer back to this response.  Id.

      1.  FirstLine's Challenge

      FirstLine originally challenged the 40 percent small business participation standard on the understanding that it constituted a bright-line requirement, not a goal. See Compl. ¶¶56-70.  However, even after TSA made the above corrections, FirstLine still contends that the 40 percent goal is (1) contrary to certain provisions of the FAR as well as the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2305, and (2) lacking a rational basis.  FirstLine advances several arguments why this is so.

      As an initial matter, Plaintiff argues that notwithstanding the agency's use of the word "goal" and its clarifying amendment to the Q&A, multiple (un-amended) sections of the RFP – including Section L.6 (Proposal Submission Requirements), quoted at length above – continue to grant TSA the ability to exclude as nonresponsive any proposal that falls short of the subcontracting standard.  Pl. Mem. at 23-24; Pl. Reply at 9-11; see also AR at Tab 4, p. 181 (RFP § M.4 (Order of Importance), providing under the heading of "Compliance / Responsiveness" that "[p]roposals that do not respond to all the requirements in the solicitation may be rejected without further evaluation, deliberation, or discussion.  The Government may reject any proposal that is evaluated to be significantly not compliant with or responsive to the solicitation requirements.  The CO will review … specifically the following … (6) Subcontracting Plan[.]").

      Even if the 40 percent standard were truly a goal, however, FirstLine maintains that it is contrary to law and regulation, as well as arbitrary and capricious, for the following reasons.

      First, Plaintiff contends that the 40 percent small business goal violates the plain meaning of FAR 52.219-9 and FAR Subpart 19.7, both of which reference small business goals in terms of a percentage of total *subcontracting* dollars, not total *contract* dollars. Pl. Mem. at 10-11; see also FAR 52.219-9(d)(1) (providing that an "offeror's subcontracting plan shall include … [g]oals, expressed in terms of percentages of total planned subcontracting dollars …"); FAR 52.219-9(b) (defining an "individual contract plan" as "a subcontracting plan that covers the entire contract period …, applies to a specific contract, and has goals that are based on the offeror's planned subcontracting in support of the specific contact…"); FAR 19.701 (same).

      Second, FirstLine argues that the 40 percent standard violates CICA's requirement that agencies "solicit bids or proposals in a manner designed to achieve full and open

competition for the procurement."  Pl. Mem. at 11; 10 U.S.C. § 2305. Essentially, FirstLine's argument here is that by "dramatically limit[ing] the offerors [*i.e.*, subcontractors] that [are] eligible to perform forty percent of the total contract value," the RFP violates this general mandate of CICA.  Id. (emphasis removed).

Third, FirstLine contends that the small business goal is unlawful because it "improperly uses the FAR's subcontracting provisions to impose, in effect, a partial set-aside of 40 percent of the contract without complying with the set-aside requirements set forth in FAR[.]"  Id. at 12.  More specifically, FirstLine argues that the 40 percent goal is in contravention of FAR 19.502-3(a), which provides that a contracting officer "shall" set aside a portion of the work to be performed under a contract for "exclusive small business participation" when (among other conditions) "the requirement is severable into two or more economic production runs or reasonable lots,"  and "[o]ne or more small business concerns are expected to have the technical competence and productive capacity to satisfy the set-aside portion of the requirement at a fair market price[.]"  FAR 19.502-3(a)(2), (3).  In FirstLine's estimation, "providing passenger screening services at a major airport like MCI is not the type of activity that can be divided into reasonable lots and set-aside without sacrificing high quality performance and competitive pricing."  Pl. Mem. at 12.

Fourth, FirstLine argues that TSA's failure to analyze adequately either the feasibility of the 40 percent standard or its impact on cost and the quality of performance is both (1) contrary to FAR and (2) evidence that the goal is arbitrary and capricious.

With respect to the first of these arguments, FirstLine posits that relevant provisions of the FAR "obligate" TSA to conduct market research that specifically identifies sufficient qualified small businesses prior to establishing any small business participation goals.  Pl. Reply at 16.  In support of this argument, Plaintiff cites, *inter alia*, FAR 7.102(a)(2) (requiring agencies to "perform acquisition planning and conduct market research … for all acquisitions in order to promote and provide for …[f]ull and open competition[.]"); FAR 10.001(a)(3)(i) (agencies must "use the results of the market research to [d]etermine if sources capable of satisfying the agency's requirements exist[.]"); FAR 10.002(b)(1)(vii) (market research should include the determination of, among other things, the "[s]ize and status of potential sources"); and FAR 19.705-4(a)(1), (c) (respectively, in reviewing subcontracting plans, the contracting officer "shall consider … [the] [p]revious involvement of small business concerns as prime contractors or subcontractors in similar acquisitions," and "[in] negotiated acquisitions …[s]ubcontracting goals should be set at a level that the parties reasonably expect can result from the offeror expending good faith efforts to use small businesses").  Pl. Reply at 15-16.   In essence, Plaintiff contends that "[t]aken together," these provisions impose an affirmative obligation on TSA to "ascertain whether sufficient qualified small businesses exist prior to establishing the [small business subcontracting] 'goals.'"  Id. at 16.

While TSA did, in fact, conduct market research prior to issuing the challenged solicitation, see AR at Tab 11,[5] FirstLine argues that it fell short of the specificity allegedly required by this collection of FAR provisions. For example, the report lists thirteen firms that were "specifically researched to determine size, capabilities, past performance, and special business practices," only four of which were "small," and none of which were identified as disadvantaged, woman-owned, HUBZone, or SDVOSB. Id. at p. 627.

Finally, FirstLine argues that the contents of the market research report demonstrate that the 40 percent goal is irrational. One part of this argument flows directly from FirstLine's assertion that TSA was required to specifically identify sufficient qualified small business concerns before establishing the subcontracting goal. In Plaintiff's words, "[i]mposing small business participation requirements for specific types of small businesses without identifying whether any of the specific types of small businesses even exist is the epitome of arbitrary agency action." Pl. Mem. at 15. In a more general sense, however, FirstLine also argues that the dearth of evidence showing whether TSA conducted *any* inquiry into small business participation in screening services establishes that this goal is irrational. Thus, Plaintiff posits that:

> If TSA had thought about how its approach would impact performance and price, and determined that any negative impact to performance and price is outweighed by the benefit of promoting small business participation, that decision would be afforded appropriate deference. But the administrative record shows that TSA undertook no analysis of any kind, and an agency that fails to apply its expertise through reasoned decision-making is not due any deference from a reviewing court.

Pl. Reply at 15; see also Pl. Mem. at 16-17.

2.  Defendant's Response

Defendant counters that the 40 percent small business goal is lawful, rational, and an appropriate application of the express "policy of the Government to provide maximum practicable opportunities in its acquisitions to small business [concerns]." Gov't Mem. at 11 (quoting FAR 19.201(a)); see also FAR 52.219-8(a). Although the Government acknowledges that FAR 52.219-9 and Subpart 19.7 speak of small business goals in terms of a percentage of total subcontracting dollars (as opposed to total contract dollars), it argues that nothing in either of these provisions, nor any other part of the FAR,

---

[5] However, as FirstLine notes, TSA's market research report is undated.

*prohibits* an agency from setting a small business goal expressed as a percentage of total contract price.  Thus, Defendant argues that FirstLine does not, and cannot, identify a single affirmative bar to such a practice, and cites FAR 1.102(d) for the proposition that a procurement strategy is permissible if not specifically prohibited.  Gov't Reply at 2.  That provision states:

> In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR, nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

FAR 1.102(d).

Moreover, as Defendant points out, "[b]ecause an offeror knows (and must identify) the total contract dollars that it intends to subcontract, an offeror's small business goals can be readily expressed in terms of *both* total contracting dollars and subcontracting dollars."  Gov't Mem. at 8 (citing FAR 19.704(a)(2)) (emphasis in original).  Thus, the agency argues that there is nothing inconsistent between the language employed by the FAR and TSA's establishment of a small business goal expressed as a percentage of total contract value – and, as evidence of such, points to the fact that several agencies have engaged in such practices without challenge.  See Gov't Reply at 3 n.1 (collecting solicitations).[6]

Emphasizing that the 40 percent standard is a "goal," not a requirement, Defendant also rejects Plaintiff's contention that this term constitutes a "set-aside," and argues that "[i]f anything, the FAR's provisions permitting an agency to set-aside an entire contract, or portion of a contract, for exclusive small business participation bolsters an agency's discretion to set small business subcontracting goals as it deems appropriate."  Gov't Mem. at 10.  Similarly, Defendant contends that properly understood as a goal, the 40

---

[6]   Defendant also notes that a proposed rule currently under consideration by the Small Business Administration ("SBA") would amend that agency's regulations to expressly permit the setting of subcontracting goals in terms of total contract value.  Although the revised regulation would require agencies to establish their subcontracting goals "in terms of the total dollars subcontracted and as a percentage of total subcontract dollars," it would *also* expressly allow them, at their option, to "establish additional goals as a percentage of total contract dollars."  Small Business Subcontracting, 76 Fed. Reg. 61,626 (October 5, 2011) (proposing implementations of various provisions of the Small Business Jobs Act of 2010).  While the Court does not assign any weight to the terms of a regulation that has yet to be enacted, it acknowledges that in the preamble to the proposed rule, the SBA cited the fact that "[c]ontracting officers are already doing this" as among the reasons for the proposed amendment  Id.

percent standard does nothing to restrict "full and open competition," and therefore cannot be in contravention of CICA.  Id.

Moreover, with respect to Plaintiff's irrationality argument, Defendant quotes FAR 19.201(a) for the proposition that:

> It is the policy of the Government to provide maximum practicable opportunities in its acquisitions to small business, veteran-owned small business, service-disabled veteran small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns.  Such concerns must also have the maximum practicable opportunity to participate as subcontractors in the contracts awarded by an executive agency, consistent with efficient contract performance.

Defendant argues that the 40 percent goal is fully consistent with this policy, and within its discretion to establish.  Pl. Mem. at 11.  It cites the proposition that government officials are presumed to act in good faith, id. at 13 (citing Eskridge Research Corp. v. United States, 92 Fed. Cl. 88, 95 (Fed. Cl. 2010)), and argues that any challenge to the business participation standard "ignores the evaluation process set forth in the solicitation and [constitutes] a premature challenge to a review that TSA has not yet performed." Gov't Reply at 5-6 (citing id.).

Defendant emphasizes that the solicitation and the FAR call for an offeror's subcontracting plan to be subject to a reasoned negotiation between the offeror and the contracting officer, with the contracting officer reviewing proposed subcontracting plans for evidence of the offeror's "due diligence" in meeting the goal.  Gov't. Reply at 5 (citing AR at Tab 4, p. 17 and FAR 19.705-4(c)).  Defendant also states that FirstLine's irrationality argument is based on the faulty and baseless assumption that "utilizing small business subcontractors will negatively affect the quality of security screening services at MCI."  Id. at 6.  Lastly, although Defendant concedes that the 40 percent goal "could have an effect on the total cost of its contracts generally and on this contract specifically," it states that the agency places a greater priority on maximizing small business participation than it does on achieving the lowest possible cost for this procurement. Gov't Reply at 7.  In sum, Defendant argues that its "experience with small businesses who [sic] have successfully performed security screening services, along with the Government's policy of maximizing opportunities to small business concerns, provides ample justification" for its decision to establish the 40 percent goal.  Id. at 6-7.

### 3.   The Court's Resolution

If the Court were issuing this solicitation instead of this agency, it may well have based the rather aggressive small business goals on more robust market research, and it likely would have stated the goals as a percentage of subcontracting dollars, as FAR Part 19 authorizes.  In this way, the prime contract offerors would have had the discretion to determine on their own how much of the work they were prepared to subcontract, and the desired level of subcontracting would not have been dictated by the federal agency. Nonetheless, the Court finds that under the applicable standards of review, it does not particularly matter that the Court might have conducted this procurement differently. What matters is the difficult burden of proof that a protester must meet in order to prevail.  FirstLine has fallen short of establishing its entitlement to judicial relief, for the following reasons.

#### a.   The 40 Percent Standard is a Goal, Not a Requirement

First, the Court is satisfied that TSA's September 27, 2012 amendment adequately addresses FirstLine's concern that the 40 percent standard will operate as a bright-line requirement or "set-aside."  That amendment clearly states that "[f]ailure to meet the stated 40% small business participation goal would not necessarily render a proposal ineligible for award," and also expresses the agency's expectation that prospective offerors "aggressively support … small business participation" by "demonstrat[ing] due diligence in [their] effort[s] to meet the stated goals."  AR at Tab 16, p. 710 (Revised Question 190).

Notwithstanding this language, FirstLine has cited other terms of the solicitation for the proposition that TSA retains the discretion to exclude as non-responsive any proposal that falls short of the subcontracting goal. The Court disagrees.  For example, Section L.6 (Proposal Submission Requirements) states that:

> The contracting officer will review the subcontracting plan for adequacy, ensuring that the required information, goals and assurances are included in accordance with FAR 19.705-4.  The subcontracting plan will be negotiated prior to contract award.  If the apparently successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer before contract award, the offeror will be ineligible for award.

AR at Tab 4, p. 176.  Several aspects of this language, and related regulations, are salient here.  First, the Court disagrees with FirstLine's assertion that Section L.6 "provides that an offeror that *fails to meet* the 'small business goals' will be 'ineligible for award.'"  Pl. Mem. at 23-24 (emphasis added).  By its plain terms, Section L.6 is simply not that

draconian:  it does not speak in terms of failing to meet a bright-line threshold, but rather in terms of "fail[ing] to negotiate a subcontracting plan acceptable to the contracting officer before contract award[.]"

Second, nothing in FAR 19.705-4, which contains the standards under which a contracting officer must review and negotiate a subcontracting plan, provides support for FirstLine's assertion that a proposal falling short of the 40 percent goal could be rejected, without further analysis, as non-responsive.  To the contrary, FAR 19.705-4 lists a number of factors that a contracting officer must take into consideration in evaluating (and negotiating) an offeror's proposed subcontracting plan.  As FirstLine pointed out at oral argument, many of these considerations run, in essence, to both the reasonableness and feasibility of subcontracting at given levels within a given procurement.  They include, for example, the "[p]revious involvement of small business concerns as prime contractors or subcontractors in similar acquisitions," and "[p]roven methods of involving small business concerns as subcontractors in similar acquisitions."  FAR 19.705-4(a)(1), (2).  Moreover, under subsection (d)(2), the contracting officer must:

> [E]nsure that the goals offered are attainable in relation to --
>
> (i) The subcontracting opportunities available to the contractor, commensurate with the efficient and economical performance of the contract;
>
> (ii) The pool of eligible subcontractors available to fulfill the subcontracting opportunities; and
>
> (iii) The actual performance of such contractor in fulfilling the subcontracting goals specified in prior plans.

And, under subsection (5), when evaluating subcontracting potential, the contracting officer must also take into account "the known availability of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns in the geographical area where the work will be performed, and the potential contractor's long-standing contractual relationship with its suppliers."

FirstLine may well be correct that a number of these considerations will ultimately cut against the feasibility of any offeror fully realizing the 40 percent goal established by TSA.  What FirstLine fails to appreciate, however, is that *precisely for this reason*, FAR 19.705-4 provides a structural safeguard for proposed plans that may fall short of the 40 percent goal.  By requiring the contracting officer to take such ameliorating factors into consideration when evaluating proposed plans for adequacy, FAR 19.705-4 ensures that a proposal falling short of the subcontracting goal must nonetheless be given due

-16-

consideration before being rejected as non-responsive. Indeed, subsection (c) of the provision counsels that "[n]o goal should be negotiated upward if it is apparent that a higher goal will significantly increase the Government's cost or seriously impede the attainment of acquisition objectives." Thus, neither Section L.6 nor FAR 19.705-4 converts the 40 percent goal into a bright-line requirement.

As noted above, FirstLine also cites Section M.4 in support of its argument that the goal is a requirement in disguise. This section provides, under the heading of "Compliance/Responsiveness" that "[p]roposals that do not respond to all the requirements in the solicitation may be rejected without further evaluation, deliberation, or discussion. The Government may reject any proposal that is evaluated to be significantly not compliant with or responsive to the solicitation requirements. The CO will review … specifically the following … (6) Subcontracting Plan[.]" AR at Tab 4, p. 181. The section then goes on to state that "[t]he Contracting Officer will conduct a separate determination of responsibility…." Id.

The Court agrees with Plaintiff that the placement of this language under the heading of "Compliance/Responsiveness" is in tension with TSA's otherwise abundantly clear assertion that the 40 percent small business participation standard constitutes a goal, not a requirement. As TSA has made its position clear on this point throughout the course of this litigation, the Court assumes that TSA's failure to amend this language as part of its corrective action was an oversight. The Court would expect TSA to remove this lingering ambiguity in the terms of the solicitation.

b. The 40 Percent Goal is Lawful

The Court also holds that the 40 percent goal is lawful. Although FAR 52.219-9 and Subpart 19.7 speak of small business goals in terms of a percentage of total subcontracting dollars (as opposed to total contract dollars), the Court agrees with Defendant that nothing in the FAR affirmatively prohibits an agency from establishing such goals in terms of total contract value. As Defendant points out, FAR 1.102(d) expressly provides that contracting officers "may assume if a specific strategy, practice, policy or procedure … is not addressed in the FAR, nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority."

At oral argument, counsel for Plaintiff conceded that nothing in the FAR expressly prohibits the 40 percent goal, but argued that relevant sections of the regulations, especially FAR 19.704 and 19.705-4, do "address" the question, and therefore impliedly prohibit TSA's action. The first of these provisions lists eleven required components of an offeror's proposed subcontracting plan; because "planned subcontracting dollars as a percent of total contract value" is not expressly included on this list, FirstLine contends that FAR 19.704 implicitly precludes an agency from "adding" such a requirement.

However, as Defendant points out, subsection (a)(2) of that provision does require that such plans contain "[a] statement of the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to small business," including specific types of small businesses such as HUBZone and women-owned small businesses. Although the question perhaps is debatable, the Court agrees with TSA that there is nothing inconsistent with FAR 19.704 in requiring an offeror to use this number to calculate the percent of its planned subcontracting as a percent of overall contract dollars. Because the computation is quite simple, the requirement is less an "addition" to the eleven-item list than a slight modification to the *form* in which the offeror must state its planned subcontracting dollars.

Nor does FAR 19.705-4 provide the implicit bar to the 40 percent goal that FirstLine claims. As discussed in detail above, this provision supplies the standards under which a contracting officer must evaluate a subcontracting plan. It instructs the contracting officer to consider, *at the review stage*, various factors that relate to the reasonableness and feasibility of an offeror's proposed subcontracting for a given procurement; it simply does not address whether or what kinds of subcontracting goals an agency may set for prospective offerors in the first instance. Although it may seem reasonable that, in setting subcontracting goals at the "front end" of a procurement, an agency be constrained by the considerations it must take into account at the "back end" of the process, the Court finds that reading FAR 19.705-4 in this manner stretches the provision too far. As explained below, the Court finds that an agency may rationally establish aspirational small business subcontracting goals for prospective offerors, even without specifically identifying small businesses that would be qualified to perform the subcontracted work. To the extent that such goals may overestimate the size and abilities of a given small business community, FAR 19.705-4 can reasonably be read as providing a "backstop" that requires the agency to take into account market realities in evaluating proposed subcontracting plans before rejecting such plans as non-responsive.

For similar reasons, FAR 19.705-4 also stops well short of requiring, as Plaintiff claims, that an agency affirmatively "ascertain whether sufficient qualified small businesses exist prior to establishing" the small business subcontracting goals. Pl. Reply at 16. To be sure, FirstLine's argument is not that this provision, standing alone, imparts such a duty, but rather that it should be read in combination with various other FAR provisions as collectively doing so. See id. (citing, *inter alia*, FAR 7.102(a)(2) (requiring agencies to "perform acquisition planning and conduct market research … for all acquisitions in order to promote and provide for …[f]ull and open competition[.]"); 10.001(a)(3)(i) (agencies must "use the results of the market research to [d]etermine if sources capable of satisfying the agency's requirements exist[.]"); 10.002(b)(1)(vii) (market research should include the determination of, among other things, the "[s]ize and status of potential sources")).

The Court does not share Plaintiff's interpretation of these provisions. FAR Subpart 10 is devoted exclusively to market research; noticeably, this section fails to provide for any affirmative requirement before an agency may establish subcontracting goals. Moreover, again, that FAR 19.705-4 provides a "back end" set of standards according to which a contracting officer must evaluate proposed subcontracting plans does not necessarily compel the conclusion that an agency must affirmatively research these considerations at the "front end" of a solicitation. Rather, as explained below, the Court finds that one reasonable way for an agency to further its policy of maximizing small business participation is to establish a goal and then allow offerors to compete in finding innovative ways to meet or approximate that goal. Nothing in the FAR prohibits such a practice.

Finally, the Court also rejects FirstLine's contention that the 40 percent standard violates the CICA requirement that agencies "solicit bids or proposals in a manner designed to achieve full and open competition for the procurement." Pl. Mem. at 11; 10 U.S.C. § 2305. To reiterate, FirstLine's argument here is that by "dramatically limit[ing] the offerors that [are] eligible to perform forty percent of the total contract value," the RFP violates this general mandate of the CICA. Id. (emphasis removed). The Court agrees with Defendant that because the 40 percent standard is a goal, not a requirement, this argument is meritless. Moreover, contrary to FirstLine's assertion, the solicitation does not artificially limit the field of offerors; rather, it simply reconfigures the terms on which potential offerors must compete. That is, instead of competing, as they did in the past, mainly or solely on the basis of their own services, potential offerors must now *also* compete, to some degree, on their ability to locate and partner with certain types of small businesses. The Court sees nothing anti-competitive in such terms.

In reaching the above conclusions, the Court notes that several of the issues raised in this case present questions of first impression. It also acknowledges that some of these issues at least arguably present fairly close questions of interpretation. For example, in the Court's experience, FirstLine is correct that the usual practice is for "the offeror, not the agency, [to] propose[] specific percentages [of small business participation] based on its total subcontracting effort." Pl. Mem. at 23 (emphasis removed). In the same vein, the applicable regulations might reasonably be read as at least primarily contemplating such a practice, to the implied exclusion of TSA's actions here. However, because nothing in the FAR expressly prohibits TSA from establishing the 40 percent small business participation goal, the Court finds that FirstLine has, at best, established that the agency is working within a regulatory gray area.

That this may be so, however, does not authorize the Court to rule for Plaintiff on the merits. This Court reviews bid protest actions pursuant to the deferential standards set forth by the APA, 5 U.S.C. § 706. See Banknote Corp., 365 F.3d at 1350-51. Under these standards, the Court may only set aside an agency action as involving a violation of regulation or procedure where the disappointed bidder has shown "a *clear* and prejudicial

violation of applicable statutes or regulations."  Axiom Res. Mgmt., 564 F.3d at 1381 (quoting Impresa, 238 F.3d at 1332-33) (emphasis added).  In its strongest light, FirstLine has established an arguable stretching of certain relevant regulations, but this showing falls well short of the necessary threshold for judicial intervention in the procurement process.

Thus, in summary, the Court holds that the 40 percent small business participation goal is lawful.  In the alternative, it finds that any claimed violation of the relevant regulations is colorable at best, but far from "clear."  In the absence of a "*clear …* violation of applicable statutes or regulations,*" established by a preponderance of the evidence, FirstLine cannot demonstrate its success on the merits of its claims.

c.  The 40 Percent Goal is Rational

The Court also finds that the 40 percent goal is "within the bounds of reasoned decision making."  Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983).    "[P]rocurement decisions invoke ... highly deferential rational basis review.... Under th[is] standard, [a Court must] sustain an agency action evincing rational reasoning and consideration of relevant factors."  Weeks Marine, 575 F.3d at 1368-69. This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evinces that the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Balt. Gas & Elec. Co., 462 U.S. at 105.  Accordingly, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  Weeks Marine, 575 F.3d at 1371.

The Court heeds this rule, and the limits of its authority, well in this instance, as it likely would have structured the challenged solicitation differently had it done so as an original proposition.  However, the Court finds that the 40 percent goal is a rational expression of the Government's policy of affording small business concerns – and in particular certain types of small businesses, such as veteran- or women-owned – "the maximum practicable opportunity to participate as subcontractors in the contracts awarded by an executive agency, consistent with efficient contract performance."  FAR 19.201(a).

The Government concedes that the goal "could have an effect on the total cost of its contracts generally and on this contract specifically," but states that TSA currently places a greater priority on expanding small business opportunities than on achieving the lowest possible cost for this procurement.  Gov't Reply at 7.  It also rejects, as contrary to its experiences in similar procurements, FirstLine's opinion that the expansion of small business participation will come at an unacceptable cost to the quality of important

-20-

security services.  Id. at 6-7.[7]  Finally, TSA emphasizes that, pursuant to the terms of the solicitation and FAR 19.705-4, all proposed subcontracting plans will be evaluated for a demonstration of "due diligence" in meeting or approximating the goal, and will then be subject to a reasoned negotiation between the offeror and the contracting officer.  Id. at 5.

The Court agrees with the Government that its decision to structure the solicitation in this manner is within its discretion.  As discussed above, nothing in the FAR either prohibits such an approach or affirmatively requires an agency to specifically identify particular small business concerns capable of performing subcontracted services.[8]  Consequently, one rational method by which the Government may attempt to maximize small business participation is to establish a rough subcontracting goal for a given contract, and then allow potential contractors to compete in designing innovative ways to structure and maximize small business subcontracting within their proposals.

In reaching this conclusion, the Court is mindful of the limitations established by FAR 19.705-4, discussed in detail above.  Again, that provision ensures that a proposal that falls short of a given subcontracting goal must nonetheless be given due consideration before being rejected as non-responsive.  Indeed, subsection (c) of the provision counsels that "[n]o goal should be negotiated upward if it is apparent that a higher goal will significantly increase the Government's cost or seriously impede the attainment of acquisition objectives."  Likewise, FAR 19.201(a) establishes a governmental policy in favor of maximizing small business subcontracting "*consistent with efficient contract performance.*"  (emphasis added).  These provisions suggest an outer limit to the Government's discretion to accept higher costs and inefficiency in exchange for greater small business participation.  While the Court cannot say what that limit might be in these circumstances, it agrees that, at this point, it must presume that TSA officials will act in good faith in reviewing offerors' subcontracting proposals, and that any challenge to their evaluation process is at this point premature.  See Eskridge Research Corp., 92 Fed. Cl. at 95.

---

[7]  FirstLine attempted to supplement the record with a declaration from its [* * *], in which [* * *] discusses his reasons for holding such an opinion, as well as [* * *].  See Dkt. No. 32-1 ("[* * *] Decl.).  However, for the reasons set forth in the Court's order dated October 5, 2012, the contents of this declaration are irrelevant to the Court's resolution of this case on the merits.

[8]  As FirstLine points out, TSA's market research report does not identify any qualifying disadvantaged, woman-owned, HUBZone, or SDVOSB businesses.  However, the Court notes that contrary to FirstLine's assertion, this fact does not compel the conclusion that none exist.  TSA researched firms that were potentially capable of performing as the *main* contractor to the solicitation, not as subcontractors.

d.  The 40 Percent Goal Does Not Prejudice FirstLine

Finally, the Court notes that even if it were to find that the 40 percent goal were either contrary to law or irrational, it would still find that the goal does not prejudice FirstLine.

"Prejudice is a question of fact" which the plaintiff bears the burden of establishing at the merits stage by a preponderance of evidence. <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1353, 1358; <u>see also</u>, <u>e.g.</u>, <u>Jacobs Tech. Inc.</u>, 100 Fed. Cl. at 207. Because this is a pre-award protest, FirstLine would be required to show that the unlawful or irrational term(s) in the solicitation caused it to suffer "a non-trivial *competitive* injury which can be addressed by judicial relief." <u>Weeks Marine,</u> 575 F.3d at 1362 (emphasis added).

FirstLine offers two reasons why it would be prejudiced by the 40 percent goal. First, it contends that [* * *]. <u>See</u> Pl. Mem. at 24; Pl. Reply at 18. Secondly, FirstLine argues that even if [* * *], it would still suffer a competitive injury by [* * *]. Pl. Reply at 18; <u>see also</u> Pl. Mem. at 24-25.

These are not the type of "non-trivial competitive injur[ies]" contemplated by the <u>Weeks Marine</u> standard.  Essentially, FirstLine's first argument is that meeting or approximating the 40 percent small business participation goal [* * *].  However, even assuming this to be true, FirstLine fails to offer any explanation as to why such a state of affairs would cause it to suffer a redressable, *competitive* harm as compared to other potential offerors.  All such entities will confront the same small business community, as it currently exists in the greater Kansas City area.  If, as FirstLine claims, the 40 percent subcontracting goal set by TSA [* * *], such will be the case for *all* offerors.  Nonetheless, under the terms of the solicitation, TSA would be permitted to favor the offeror who came closest to meeting the aspirational goal.  In other words, all offerors have an equal opportunity to locate potential small business partners in or near Kansas City, to the extent they exist.  That FirstLine might [* * *] is not, however, a redressable competitive injury.

Similarly, the fact that FirstLine would prefer a continuance of the status quo in TSA's new procurement is irrelevant.  Although FirstLine continues to perform screening services at MCI under a series of bridge contracts with TSA, the last contract it won competitively has expired, and TSA is free (within the boundaries set by law and regulation) to change the terms of the solicitation going forward, according to its policy preferences.  That these new terms might force FirstLine to rework its approach if it would like to retain its incumbent status is simply not the kind of judicially cognizable competitive injury contemplated by <u>Weeks Marine</u>.  FirstLine is entitled to compete on a level playing field with other potential offerors to best meet the terms of the new

solicitation; it is *not* entitled, however, to permanently lock TSA into solicitation terms that have favored FirstLine in the past.

B. Adequacy of Information

FirstLine's second objection to the solicitation is that it contains insufficient information to permit offerors to compete intelligently and on relatively equal terms. Compl. ¶¶ 40-46. As FirstLine points out, there are several categories of information (discussed in greater detail below) that TSA included in the initial solicitation, but has omitted, without explanation, from the current one.  Id. ¶¶ 40, 42.  FirstLine concedes that some of the missing data is publically available, and that TSA made additional information available to offerors via a Power Point presentation at a May 15, 2012 site visit to MCI.   However, FirstLine contends that unless TSA formally amends the solicitation to include this data, offerors will be unable to prepare accurate and responsive proposals.  Pl. Mem. at 24-30; Pl. Reply at 18-23.  Secondly, FirstLine argues that "even if TSA's piecemeal approach were permitted," the aggregate data put forth by the agency "still omit[s] critical information."  Pl. Reply at 21.

FirstLine concedes that, as the incumbent, it "has the knowledge base to fill in many of the [alleged] gaps[.]"  Id. at 23.  However, FirstLine argues that it is nonetheless prejudiced by the alleged omissions because they will likely cause other offerors to "unwittingly underestimate the staffing needs at MCI," thereby preventing TSA from comparing proposals on an "apples-to-apples" basis.  Id.

Defendant responds that much of the information FirstLine complains is missing from the solicitation is, in fact, contained within the document.  Gov't. Reply at 7-8. Defendant further contends that the solicitation contains all information necessary to the formulation of accurate and responsive proposals.  The fact that the agency provided additional information to potential offerors outside of the four corners of the document does not render the solicitation deficient.  Id. at 8. Finally, Defendant argues that because the solicitation clearly directs offerors to develop their own staffing approaches (and establishes criteria for the evaluation of the same), the agency is under no obligation to provide potential offerors with its internal staffing estimates, as demanded by Plaintiff. Id. at 9-10.

FirstLine is correct that, "[a]s a general rule, offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis." Glenn Def. Marine (Asia) PTE Ltd. vs. United States, 97 Fed. Cl. 568, 578 (Fed. Cl. 2011) (quoting Interface Flooring Sys., Inc., B-225439, 87-1 CPD ¶ 247, at *5 (Comp. Gen. Mar. 4, 1987)).   "When a solicitation lacks sufficient detail and 'permits each offeror to define the specification for itself, and to the extent they do so differently, the offerors are not competing on an equal basis.'"  Id.  However, while:

> [s]pecifications must be free from ambiguity and describe the
> minimum needs of the procuring activity accurately.... there
> is no legal requirement that a competition be based on
> specifications drafted in such detail as to eliminate
> completely any risk for the contractor or that the procuring
> agency remove all uncertainty from the mind of every
> prospective offeror.

Richen Mgmt., LLC, B-406850, 2012 CPD ¶ 215, at *3 (Comp. Gen. July 31, 2012)
(citing Am. Contract Servs., Inc., B-256196, 94-1 CPD ¶ 342, at *1 (Comp. Gen. June 2,
1994)).

In other words, the "mere presence" of risk in a solicitation does not render it
inappropriate or improper. Katmai Info. Techs., LLC, B-406885, 2012 CPD ¶ 277, at *4
(Comp. Gen. Sept. 20, 2012). To the contrary, "[r]isk is inherent in most type[s] of
contracts, particularly fixed-price contracts," Supreme Foodservice GmbH, B-405400.1,
2011 CPD ¶ 244, at *7 (Comp. Gen. Oct. 31, 2011), and an agency retains the discretion
"to offer for competition a proposed contract that imposes maximum risks on the
contractor and minimum burdens on the agency[.]" Katmai Info. Techs., LLC, B-
406885, 2012 CPD ¶ 277, at *4. It is the offeror's responsibility to "account for [such
risk] in formulating its proposal." Id.

After careful consideration, and for the reasons explained below, the Court finds
that TSA has provided prospective offerors with adequate information to prepare accurate
and responsive proposals.

In its complaint, FirstLine identified several specific categories of data that TSA
included in the first solicitation, but allegedly excluded from the current one. Compl. ¶
40. These include MCI's hours of operation; the number of screening checkpoints, exit
lanes, gates per terminal, walk-through metal detectors, x-ray machines, and explosive
trace detectors at the airport; the average baggage screened per day and during peak
phases; daily enplanements and departing flights; the specific quantity of equipment, such
as computers, pagers, and cell phones, that the Government would provide; the
availability of break rooms and training rooms; and the estimated number of productive
hours needed to perform the contract. Id.

As a technical matter, FirstLine's claim appears to be that *all* of this information is
necessary to the formulation of accurate and responsive proposals. However, it is the
Court's understanding that, as a practical matter, Plaintiff is most concerned about the
omission of the very last item in that list, TSA's staffing estimates for the contract. See
Pl. Reply at 22-23. Because labor costs will constitute a large portion of the contract
value, FirstLine argues that "[f]or TSA to withhold this critical information in a five-year,
… fixed-price effort imposes unacceptable risk on contractors." Id. at 22. The Court will

address each of the various categories of data identified by Plaintiff and alleged to be necessary to the formulation of responsive proposals.

1.  Information Included in the Solicitation

As a preliminary matter, the Court notes that, as Defendant points out, the solicitation in fact contains much of the data alleged to be missing, including the number of terminals, screening checkpoints, exit lanes, metal detectors, and X-ray machines at MCI, as well as information regarding the number and size of break rooms and training rooms to which the awardee will be given access.  See AR at Tab 6, p. 273-75, 353 (Questions 80 and 81).  In addition, although FirstLine complains in its reply brief that the solicitation does not provide "equipment configurations (collocated versus stand alone) for each baggage location," Pl. Reply at 21, TSA correctly points out that the solicitation does state, for each checkpoint, whether the baggage screening equipment in use consists of a stand-along Reduced Size Explosive Detection System ("RSEDS") or an Explosive Detection System ("EDS") unit that is part of an in-line screening system. Gov't Reply at 8 (citing AR at Tab 6, p. 273).

2.  Publically or Otherwise Available Information

Certain other categories of information, while not contained within the four corners of the solicitation, are publically available and easily located through basic internet searching.  For example, the MCI website lists its hours of operation (24 hours per day),[9] and also provides a detailed, month-by-month tally of the airport's traffic statistics, including deplanements and enplanements, dating back three years.[10]   In addition, as FirstLine concedes, TSA made other categories of data – including a map of the MCI terminal area; the number of terminals, checkpoints, and security lanes in the airport; and data on the average number of checked bags processed daily and monthly – available to potential offerors during a May 15, 2012 site visit to MCI hosted by the agency.  Specifically, this and other information was made available via a Power Point presentation given by a TSA official during the course of that day.  See AR at Tab 14. After the site visit had concluded, TSA posted a truncated but substantially equivalent version of that Power Point on FedBizOpps.gov for prospective offerors who were unable to attend the visit.  See AR at Tab 15.

Nonetheless, FirstLine makes two arguments regarding the adequacy of this information.  First, Plaintiff contends that because "'[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation,'" TSA is required to formally amend the solicitation to include the Power Point slides, as

---

[9] See http://www.flykci.com/AviationDepartment/KCIAirportInfo/Index.htm  (site last visited November 19, 2012).

[10] See http://www.flykci.com/Newsroom/TrafficStats/Index.htm (site last visited November 19, 2012).

well as the publically available information described above.  Pl. Mem. at 28 (quoting Banknote Corp., 56 Fed. Cl. at 386.  Secondly, FirstLine argues that the version of the Power Point shown during the site visit contains substantial and critical information that was omitted from the edited version posted online.  See id. at 29-30.  Although three FirstLine representatives attended the site visit, and Plaintiff therefore acknowledges that it is in possession of all the information at issue, it argues that its proposal cannot be evaluated on an "apples-to-apples" basis if all offerors are not working from identical data sets.  Id. at 30.

The Court disagrees.  First, after making a slide-by-slide comparison of the two versions of the Power Point, the Court concludes that the publically available iteration contains substantially the same information as the one presented to the attendees of the site visit.  The omitted slides of which Plaintiff complains contain the following data points: a chart depicting national historical air travel demand, dating back to 1975; a chart depicting the annual number of passengers at MCI, also dating back to 1975;[11] the number of MCI employees; the number of non-stop destinations, daily departures, and daily non-stop seats; the amount of the airport's 2012 budget; the fact that its largest source of revenue is parking; and general information regarding the possibility of a future expansion of the airport.  AR at Tab 14, p. 655, 660-61, and 669-71.  This information is either otherwise publically available, non-essential to the formulation of a responsive proposal, or both.[12]

Secondly, the Court is aware of no affirmative rule – in either the FAR, statute, or case law – that an agency must make all information that is relevant to a given procurement available within the four corners of the solicitation.  The rule cited by Plaintiff, that "'agencies must evaluate proposals and make awards based on the criteria stated in the solicitation,'" Pl. Mem. at 28 (quoting Banknote Corp., 56 Fed. Cl. at 386), refers to the *evaluative standards* according to which an agency reviews proposals, not the data relevant to the formulation of the same.  See Banknote Corp., 56 Fed. Cl. at 386 ("[T]he government may not rely upon undisclosed evaluation criteria in evaluating proposals[.]").  While the Court does not question the validity of this rule, it finds the rule immaterial to the issue of how much data an agency must provide – and the manner in which it must do so – in order to allow offerors to "compete intelligently and on a relatively equal basis."  Glenn Def. Marine, 97 Fed. Cl. at 578.  Therefore, to the extent

---

[11] The chart does not specify whether "passengers" includes persons flying into or out of MCI, or both.

[12] While FirstLine attempts to make much of the fact that the solicitation is silent regarding the possible future expansion of MCI, TSA has represented to the Court that it "does not own or operate MCI and whether such changes occur, or the timing of possible changes, is entirely outside of TSA's control." Gov't Mem. at 16 n.3.  The Government further states that "[a]s in other procurements, if the scope of work substantially changes after contract award, the contract awardee would be permitted to submit a request for equitable adjustment under the terms of the contract."  Id.  For these reasons, the Court agrees with TSA that the possible future expansion of the airport is irrelevant to this protest.

that the data FirstLine complains of is available from public sources, including the edited Power Point, the Court finds no basis to require TSA to amend its solicitation so as to include equivalent data.

### 3.  Staffing Estimates

As noted above, the Court understands FirstLine's greatest concern to be the solicitation's failure to include "staffing [data] based on configuration, equipment, and productive hours for each job category outlined in the RFP," expressed in "precise numeric quantities/hours[.]"  Pl. Reply at 21.  Again, FirstLine's argument here is that because labor costs will constitute a large portion of the contract value, which is fixed-price, this omission "imposes unacceptable risk on contractors."  Id. at 22.  Defendant responds that because the solicitation (1) requires offerors to develop their own staffing approaches and (2) establishes criteria for the evaluation of the same, it is not required to disclose its precise staffing estimates.  Gov't Reply at 9-11.

The Court agrees that TSA is under no obligation to provide potential offerors with its internal staffing estimates, as demanded by Plaintiff.   As noted above, "[r]isk is inherent in most types of contracts, particularly fixed-price contracts," Supreme Foodservice GmbH, B-405400.1, 2011 CPD ¶ 244, at *7, and an agency retains the discretion "to offer for competition a proposed contract that imposes maximum risks on the contractor and minimum burdens on the agency[.]"  Katmai Info. Techs., LLC, B-406885, 2012 CPD ¶ 277, at *4.  It is the offeror's responsibility to "account for [such risk] in formulating its proposal."  Id.

TSA appears to have opted for such an approach here, and the Court finds no reason to disturb it.  Indeed, as Defendant points out, as long as agencies otherwise provide sufficient information regarding their needs for a given procurement, they "'are not required to disclose a staffing model used to assess the adequacy of proposed [staffing] or offerors' understanding of the work involved in a procurement.'"  Gov't Reply at 10 (quoting P.E. Sys., Inc., B-249033, 92-2 CPD ¶ 409, at *5 (Comp. Gen. Dec. 14, 1992) and collecting cases).  Just as "there is nothing improper in an agency's comparing proposed prices with an undisclosed independent government estimate," nor is there any impropriety in "an agency … us[ing] an undisclosed government estimate of the appropriate labor mix in evaluating proposals[.]"  P.E. Sys., Inc., B-249033, 92-2 CPD ¶ 409, at *5.

The solicitation clearly calls for offerors to develop their own, innovative approaches to staffing, AR at Tab 4, p. 65-66, 170-71, 244-45, and 386 (Questions 263-66), and establishes standards according to which TSA will evaluate offerors' proposals, id. at p. 170-71.  In addition, while TSA has declined to disclose, as requested by Plaintiff, its estimated "staffing [data] based on configuration, equipment, and productive hours for each job category outlined in the RFP," expressed in "precise numeric

quantities," Pl. Reply at 21, it *has* provided offerors with its estimated "historical productive hours" for fiscal years 2009 through 2011, AR at Tab 7, p. 341 (Revised Question 4). The Court finds that this information, in combination with the other information made available by TSA (or otherwise publically available) is sufficient to allow potential offerors to develop responsive staffing proposals.

### 4. Other Information

The Court identifies one remaining category of information requested by FirstLine and not addressed above:  the specific quantity of equipment, such as computers, pagers, and cell phones, that the Government will provide to the awardee.  The Court holds that this information is not of sufficient magnitude to justify judicial intervention in this procurement process.

Finally, while the document is not at issue in this protest, the Court notes that in addition to the information discussed above, TSA has made available to potential offerors its Standard Operating Procedure ("SOP") guide.  See AR at Tab 9.  Because the SOP contains Sensitive Security Information ("SSI"), TSA stated in its pre-solicitation notice that the document could "only be accessed by individuals who have successfully passed a Security Threat Assessment," and provided directions to potential offerors as to how they could go about meeting this prerequisite.  AR at Tab 1, p. 41.  FirstLine and several other prospective offerors followed these instructions and eventually received the SOP, which contains extensive information regarding TSA's procedures and standards.   TSA contends, and Firstline does not dispute, that the information contained in the SOP is of great value to prospective offerors in constructing their proposals.

For the reasons explained above, the Court concludes that collectively, the information made available to potential offerors through the solicitation and its amendments, publically available sources, including the edited Power Point, and the SOP, is sufficient to enable offerors to craft proposals that are accurate and responsive to the requirements of the solicitation.

## Conclusion

For the reasons stated above, the Court GRANTS the Government's motion for judgment on the administrative record, and DENIES Plaintiff's cross-motion for the same, as well as its separate motion for injunctive relief.  Accordingly, the Court directs the Clerk of Court to enter judgment for the Government.  However, the Court suggests that the agency amend Section M.4 of the solicitation to remove the ambiguity regarding the 40 percent small business participation goal.  In fairness to prospective offerors, so they may refashion their proposals as needed, the Court also suggests that the closing date for receipt of proposals be extended by 20-30 days from the date of this decision.

This decision is filed under seal.  On or before November 27, 2012, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court any proposed redactions before the opinion is released for publication.

If there are any further protests arising from this solicitation, the filing party should submit a notice of related case under RCFC 40.2, and request the Clerk's office to assign the case to Judge Wheeler.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge